AO 106 (Rev. 04/10)  Application for a Search Warrant

**FILED**

JUL 0 9 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>iCloud account associated with Apple ID:<br>travisballou@ymail.com | )<br>)<br>)<br>)<br>)<br>)<br><br>Case No.  **19 MJ 2852** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 | Distribution of Fentanyl Resulting in Death |

The application is based on these facts:

See attached affidavit of DEA Special Agent Eric Helton

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Eric Helton, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  7/9/19

_____
*Judge's signature*

City and state:  San Diego, California

Hon. William V. Gallo, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Eric Helton, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple Inc. (hereafter "Apple") to disclose to the government records and other information, including the contents of communications, associated with the Apple ID: travisballou@ymail.com, that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at 1 Infinite Loop, Cupertino, CA. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B.

2.     I am a Special Agent Criminal Investigator for the United States Drug Enforcement Administration (DEA), and I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code.  I am empowered by law to conduct investigations and to make arrests for felony offenses.  I was hired by the DEA in August of 2004, and I attended the DEA academy for approximately sixteen (16) weeks. At the DEA Academy, I was trained in the various aspects of conducting narcotics investigations. In December 2004, I was sworn as a DEA Special Agent (SA) and was assigned to DEA San Diego Field Division (SDFD).

3.     While with the DEA, I have participated in excess of 100 investigations targeting individuals and drug transportation organizations (DTOs) for: the unlawful importation, exportation, manufacture, and distribution of controlled substances; the laundering of illicit drug proceeds and monetary instruments derived from activities related to the distribution of controlled substances; and/or conspiracies associated with unlawful narcotics related offenses. More specifically, these investigations have

1

involved debriefing defendants, witnesses and informants, conducting surveillance, assisting in court ordered interceptions, executing search warrants, seizing controlled substances and narcotics-related assets and making arrests for controlled substance violations.

4.      I am currently assigned to the DEA San Diego Field Division's (SDFD) San Diego County Integrated Narcotics Task Force (NTF) Team 10 and have been since June 2018. NTF Team 10 is comprised of DEA SAs, Task Force Agents (TFAs) and Task Force Officers (TFOs) from the San Diego Police Department (SDPD), Department of Homeland Security Investigations (HSI), Federal Bureau of Investigation (FBI) and Department of Health Care Services (DHCS). NTF Team 10 primarily investigates illegal drug trafficking organizations (DTOs) operating in the United States and internationally, including those DTOs whose operations involve the distribution of wholesale quantities of fentanyl, oxycodone, hydrocodone, other controlled pharmaceutical drugs, cocaine, methamphetamine, marijuana, heroin and hashish in and around the San Diego, California area. Team 10 focuses on investigating illegal drug distribution related to drug overdose deaths in San Diego County.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachment A contains evidence of violations of 21 U.S.C. § 841, as described in Attachment B.

**JURISDICTION**

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a),

2

(b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**PROBABLE CAUSE**

8.     On October 24, 2018, National City Police Department (NCPD) Officers were called to respond to a report of a deceased female, who was subsequently identified as Jackie Christine GALVAN, who appeared to have suffered a drug overdose.[1] GALVAN was found at her friend, AC's, residence located at 1938 East 17th Street, National City, California 91950.

9.     At approximately 7:03 p.m., NCPD officers responded to the aforementioned residence. After numerous attempts at resuscitation, paramedics on scene pronounced GALVAN deceased. GALVAN had a visible mark on her left arm that appeared to be the site of a recent injection. GALVAN's black iPhone was found on the chair where she had been sitting.

10.     Team 10 agents responded to the residence at approximately 8:30 p.m. and took custody of GALVAN's iPhone. Additionally, agents spoke with a witness, AC. AC stated she knew of GALVAN's heroin usage and would often try to talk GALVAN out of using. AC said she had communicated with GALVAN earlier in the day and learned that GALVAN had overdosed the previous day (Tuesday, October 23, 2018), was taken to the hospital, and was subsequently released. GALVAN told AC she had overdosed from the pre-loaded syringes she obtained from her source of supply (SOS). AC stated GALVAN arrived at her residence in the early afternoon. According to AC, GALVAN asked if she could borrow twenty dollars to pay back a friend, and AC agreed. Shortly thereafter, AC observed GALVAN walk out to a vehicle that had pulled

---

[1] On January 18, 2019, agents received GALVAN's final report from the San Diego County Medical Examiner's office that concluded GALVAN's cause of death was acute fentanyl and heroin intoxication.

1  up in front of the residence and speak with the individual in that vehicle. AC stated
2  GALVAN then walked back to the front yard of the residence and sat down on a sofa
3  chair while AC made a phone call. A few minutes later, AC noticed that GALVAN
4  appeared unconscious and in an odd position on the sofa chair. AC attempted to wake
5  GALVAN, but was unsuccessful. AC then called 911.

6      11.    On October 25, 2018, San Diego Superior Court Judge Charles G. Rodgers
7  signed a California State search warrant (#58649), authorizing both the search of
8  GALVAN's iPhone cell phone and its use in a subsequent investigation of GALVAN's
9  death. Agents subsequently reviewed the contents of GALVAN's iPhone and then
10 utilized GALVAN's iPhone in an undercover manner, posing as GALVAN.

11     12.    While conducting a review of the text message communications in
12 GALVAN's iPhone, agents identified suspected drug-related text messages between
13 GALVAN and a contact listed only as "Mr Mans!" with an associated telephone number
14 619-453-2186. "Mr Mans!" was later identified as BALLOU, after BALLOU
15 personally appeared to deliver heroin to GALVAN. The text messages indicated
16 GALVAN had previously obtained suspected heroin from BALLOU on October 22, 23,
17 and 24, 2018. Text messages from October 24, 2018 indicated that, at approximately
18 4:14 p.m., just hours before GALVAN's death, BALLOU delivered heroin to
19 GALVAN at   AC's  residence. Then, at 4:20 p.m., BALLOU told GALVAN to be
20 careful and that he meant to bring her Narcan but forgot. The next day, October 25,
21 2018, BALLOU texted GALVAN twice checking on her and stating he hoped she was
22 okay.

23     13.    On October 25, 2018, agents, acting in an undercover (UC) capacity as
24 authorized by the aforementioned search warrant, began using GALVAN's iPhone by
25 posing as GALVAN to coordinate the purchase of an additional quantity of heroin from
26 BALLOU. Ultimately, BALLOU agreed to meet agents (posing as GALVAN) at

27                                     4
28

approximately 3:00 p.m. at a restaurant parking lot located at 2140 E. Plaza Blvd., National City, California, in order to deliver heroin. When BALLOU arrived at the parking lot, he identified himself and his vehicle and told the agents where it was parked. Agents then detained BALLOU.

14.    At the restaurant parking lot, agents searched BALLOU's vehicle, based on probable cause that the vehicle contained contraband, and called BALLOU's phone number to see if they could locate BALLOU's phone. Agents found a silver iPhone model X on the driver's side floorboard of the vehicle.  Agents confirmed that this phone was associated with telephone number 619-453-2186 by observing that the phone displayed an incoming call when agents called that number.  Agents also found two loaded and capped syringes (which later tested positive for fentanyl and heroin) under the driver's seat of the vehicle. Agents arrested BALLOU and transported him to the DEA SDFD for processing and interviewing.

15.    During a post-arrest interview at the SDFD, BALLOU waived his *Miranda* rights and admitted that he came to the restaurant to sell heroin to GALVAN. BALLOU stated he met GALVAN on October 22, 2018 through a friend and sold GALVAN syringes pre-filled with heroin on October 22, 23, and 24, 2018.[2] BALLOU stated he made the heroin stronger at GALVAN's request the second time he provided her with

---

[2] Based on my training and experience and my conversations with other agents, I have learned that there are many ways that drug users consume heroin. One of the most common methods is by intravenous injection. The process for preparing heroin for intravenous injection requires that heroin, which is transported as a semi-solid gum-like substance, be liquefied so that it can be injected into the body through a syringe. Heroin is typically liquefied by mixing it with water or some other liquid and warming it over a heat source. Since a typical dose only requires a quantity of heroin measured in milliliters, the container or "cooker" used to hold the heroin while it is heating is also small. Aluminum cups that hold tea light candles are often used for this purpose. Because heroin tends to revert back to its solid state over time, the liquefaction process occurs shortly before the heroin will be used.

heroin (on October 23, 2018). BALLOU said that, on October 24, 2018, he learned from GALVAN that she had overdosed the previous day from the heroin he gave her and was taken to the hospital. BALLOU further admitted that the following day (the day GALVAN died), he delivered more heroin to GALVAN in National City, California and meant to bring her Narcan in case she overdosed again, but forgot it at his residence. BALLOU admitted to using his iPhone, the same phone found in his vehicle during his arrest, to communicate with GALVAN about heroin orders and deliveries. BALLOU acknowledged to using both text messages and voice calls to communicate with GALVAN.

16.   When questioned about where he obtained the heroin, BALLOU stated he did not wish to disclose any information regarding his SOS.

17.   BALLOU then signed two consent forms authorizing agents to search his bedroom and his iPhone cell phone. BALLOU confirmed that he resided at 8384 El Paso Street, La Mesa, California. When agents knocked on the door of that residence, Beverly Ballou (B. Ballou), BALLOU's mother, answered the door and told agents that she lived at the residence, and that BALLOU resided there with her. B. Ballou told agents that BALLOU occupied the westernmost bedroom on the south side of the house (BALLOU's bedroom).

18.   BALLOU's iPhone cell phone was later downloaded by an agent pursuant to BALLOU's consent. The download was only partially successful. Agents were able to generate reports that contained some content from BALLOU's iPhone. However, agents were unable to replicate those results on any other computer.[3]

---

[3]   Agents and a retained expert also searched BALLOU's phone pursuant to a search warrant in May and June, 2019.  The retained expert could not locate any SMS messages on BALLOU's iPhone. The remainder of the data on BALLOU's iPhone appeared to have remained intact, but the retained expert could not find any evidence that SMS messages had existed on the iPhone. BALLOU's iPhone was then returned to

1  //
2  //
3  //
4         19.    On July 2, 2019, the United States received the results from a subpoena to
5  Apple for the following information:

6                Name: Travis Ballou
                 DOB: 5/29/1978
7                Phone Number: (619) 453-2186

8  The results of the subpoena indicated that the information provided is associated with
9  an account bearing the username travisballou@ymail.com and the address 8384 El Paso
10 Street, La Mesa, California – the same address where Ballou resided. Also associated
11 with that account is a silver iPhone model X – the same make and model that agents
12 seized from Ballou on October 25, 2018. Information obtained from Apple pursuant to
13 the subpoena also indicated that the account was in "active" status.

14               **INFORMATION REGARDING APPLE ID AND iCLOUD**

15        20.    Apple is a United States company that produces the iPhone, iPad, and iPod
16 Touch, all of which use the iOS operating system, and desktop and laptop computers
17 based on the Mac OS operating system.

18        21.    Apple provides a variety of services that can be accessed from Apple
19 devices or, in some cases, other devices via web browsers or mobile and desktop
20

21 _____
22 DEA, where another expert on cell phone forensics attempted to download it, but also
   could not find any evidence that SMS messages had existed on the iPhone. The
23 government is still investigating how the SMS message were deleted from BALLOU's
   iPhone.
24        No information obtained in those searches is being relied on in seeking this
25 warrant. In an abundance of caution, I ask the court not to consider information agents
   may or may not have seen during those examinations in determining whether there is
26 probable cause for the requested warrants in this affidavit.
27                                        7
28

applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage:

      a. Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

      b. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

      c. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services, and can also be used to store iOS device backups and data associated with third-party apps.

      d. iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username

8

1   and passwords, credit card information, and Wi-Fi network information
2   synchronized across multiple Apple devices.
3      e.  Game Center, Apple's social gaming network, allows users of Apple
4          devices to play and share games with each other.
5      f.  Find My iPhone allows owners of Apple devices to remotely identify and
6          track the location of, display a message on, and wipe the contents of those
7          devices. Find My Friends allows owners of Apple devices to share
8          locations.
9      g.  Location Services allows apps and websites to use information from
10         cellular, Wi-Fi, Global Positioning System ("GPS") networks, and
11         Bluetooth, to determine a user's approximate location.
12     h.  App Store and iTunes Store are used to purchase and download digital
13         content. iOS apps can be purchased and downloaded through App Store on
14         iOS devices, or through iTunes Store on desktop and laptop computers
15         running either Microsoft Windows or Mac OS. Additional digital content,
16         including music, movies, and television shows, can be purchased through
17         iTunes Store on iOS devices and on desktop and laptop computers running
18         either Microsoft Windows or Mac OS.
19   22.    Apple services are accessed through the use of an "Apple ID," an account
20   created during the setup of an Apple device or through the iTunes or iCloud services. A
21   single Apple ID can be linked to multiple Apple services and devices, serving as a
22   central authentication and syncing mechanism.
23   23.    An Apple ID takes the form of the full email address submitted by the user
24   to create the account; it can later be changed. Users can submit an Apple-provided email
25   address (often ending in @icloud.com, @me.com, or @mac.com) or an email address
26   associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The
27                                              9
28

Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.

24. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

25. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

10

26. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

27. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example,

the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

28. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

29. For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

30. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the

12

geographic and chronological context of access, use, and events relating to the crime under investigation.

31.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

32.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

33.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

**PROCEDURES FOR ELECTRONICALLY-STORED INFORMATION**

34.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Apple to disclose to the government copies of the records and other information (including the content of communications and stored data) particularly described in Section I of Attachment B. Upon receipt of the information

described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

35.     Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The ISP's personnel are not.  It would be inappropriate and impractical for federal agents to search the ISP's vast computer network for the relevant accounts and then to analyze the contents of those accounts on the ISP's premises.  The impact on its business would be disruptive and severe.

36.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the subject ISP accounts, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the ISP's business activities, to protect the privacy of its subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, agents seek authorization to allow the ISP to make digital copies of the entire contents of the accounts subject to seizure.  Those copies will be provided to me or to an authorized federal agent.  The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B.  Relevant electronic records will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

37.     Analyzing the data to be provided by the ISP may require special technical skills, equipment, and software.  It may also be time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language,

14

or account for slang or typographical errors. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Attachments to electronic mail messages are often in proprietary formats that do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Internet Service Providers like Microsoft and Google do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

38. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by the ISP, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination of the ISPs' records will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

39. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account and any electronic communications sent or received in temporal proximity to incriminating messages that provide context to the incriminating communications.

40. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

15

1

## CONCLUSION

2      41.    Based on the forgoing, I request that the Court issue the proposed search

3   warrant.

4      42.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer

5   is not required for the service or execution of this warrant.

6

7      I swear the foregoing is true and correct to the best of my knowledge and belief.

8

9   _____

10                  Special Agent Eric Helton
                    DEA Special Agent

11

12

13   Subscribed and sworn to before me this __9__ day of July, 2019.

14

15   _____

16   Hon. William V. Gallo
    United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27                                      16

28

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with travisballou@ymail.com (the "account") that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

1

## ATTACHMENT B

**I.    Information to be disclosed by Apple**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.    All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

1

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.     The contents of all emails associated with the account from September 1, 2018 through October 24, 2018, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.     The contents of all instant messages associated with the account from September 1, 2018 through October 24, 2018,, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.     The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.     All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call

2

invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

k.      The Provider is hereby ordered to disclose the above information to the government within 7 days of service of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 21 U.S.C. section 841 involving Travis Ray Ballou between September 1, 2018 and October 24, 2018, including, for each account or identifier listed on Attachment A, any of the following data:

3

1.    All records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data for the period of September 1, 2018 to October 24, 2018.

    a.    tending to identify attempts to possess heroin, Fentanyl, or other federally controlled substances with the intent to distribute them;

    b.    tending to identify other accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the possession of heroin, Fentanyl, or other federally controlled substances with the intent to distribute them within the United States.

    c.    tending to identify co-conspirators, criminal associates, or others involved in the possession of heroin, Fentanyl, or other federally controlled substances with the intent to distribute them;

    d.    tending to identify travel to or presence at locations involved in the possession or distribution of heroin, Fentanyl, or other federally controlled substances, including stash houses, residences used to prepare or process controlled substances, and/or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code § 841.

2.    The identity of the person(s) who created or used the Apple ID.

3.    Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the crime under investigation and the account subscriber.

4